UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| ANTHONY B.,[1] | Case No.  22-cv-04951-RMI |
| Plaintiff, | **ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT AND DEFENDANT'S MOTION TO REMAND AND OPPOSITION TO PLAINTIFF'S MOTION** |
| v. | |
| MARTIN O'MALLEY, | |
| Defendant. | Re: Dkt. Nos. 17, 22 |

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying his application for disability insurance benefits as a Disabled Adult Child under Title II of the Social Security Act. *See* Admin. Rec. at 2377-2404.[2] The Appeals Council of the Social Security Administration failed to review the ALJ's decision within sixty days of its issuance. *See* Pl.'s Compl. (Dkt. 1) at 8; AR at 2378. As such, the ALJ's decision is a "final decision" of the Commissioner of Social Security, appropriately reviewable by this court. *See* 42 U.S.C. §405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge. *See* (Dkts. 3, 9). Plaintiff moves for summary judgment and requests the court remand for calculation of benefits. *See* Pl.'s Mot. (Dkt. 17) at 23. Defendant admits the ALJ's decision was not based on substantial evidence but moves the court to remand for further administrative proceedings. Def.'s Mot. (Dkt. 22) at 2. For the reasons stated below, the court grants Plaintiff's Motion for Summary Judgment

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("AR"), which is independently paginated, has been filed in thirty-two attachments to Docket Entry #13. *See* (Dkts. 13-1 through 13-32).

United States District Court
Northern District of California

United States District Court
Northern District of California

and remands for immediate calculation of benefits. Defendant's Motion is correspondingly denied.

## LEGAL STANDARDS

The Social Security Act limits judicial review of the Commissioner's decisions to final decisions made after a hearing. 42 U.S.C. § 405(g). The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* A district court has limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## SUMMARY OF THE RELEVANT EVIDENCE

### A. *Procedural History*

In July of 2014, Plaintiff applied for Disabled Adult Child ("DAC") benefits under Title II of the Social Security Act. AR at 2380. DAC benefits are available to unmarried individuals under their parent's earnings record, upon the death of a parent or at such time as a parent begins to collect social security benefits. *See* 42 U.S.C. § 402(d)(1)(B)(ii). To be eligible, the claimant must be "under a disability…which began before he attained the age of 22." *Id.* Thus, in his application for DAC benefits, Plaintiff had to demonstrate that he was disabled prior to October 28, 2005,

1   Plaintiff's 22nd birthday.[3]

2       Plaintiff's application for Title II benefits was denied initially and on reconsideration. AR

3   at 534, 548. In 2016, Plaintiff attended his first administrative hearing and received an unfavorable

4   decision shortly thereafter. *Id.* at 2380. Plaintiff timely appealed and, two years later, the decision

5   was remanded by this court at the stipulation of the parties. *Id.* at 1799-1800.

6       Plaintiff attended his second administrative hearing in June 2019 and again received an

7   unfavorable decision. *Id.* at 2380. The Appeals Council declined to review the decision and

8   Plaintiff, for the second time, timely appealed to federal court. *Id.* In July of 2021, the case was

9   remanded for further proceedings on the grounds that the ALJ (1) failed to articulate specific,

10  clear, and convincing evidence which justified the dismissal of Plaintiff's pain and symptom

11  testimony; (2) failed to provide germane reasons for dismissing the lay testimony of Plaintiff's

12  parents and treating therapist; and (3) failed to properly consider the medical opinions of

13  Plaintiff's physicians. *See A.B. v. Saul*, No. 20-cv-02697-NC, 2021 WL 2817166 (N.D. Cal. July

14  6, 2021); AR at 2381.

15      On April 5, 2022, Plaintiff attended his third administrative hearing, and he received an

16  unfavorable decision in March 2022. AR at 2381. The Appeals Council failed to review the

17  decision within 60 days (Pl.'s Compl. (dkt. 1) at 8); the court now addresses Plaintiff's third

18  appeal to federal court.

19      B. *Relevant Medical History*

20      In August of 2001, when Plaintiff was 16 and a junior in high school, he suffered his first

21  psychotic episode. AR at 863, 1413, 2363. Plaintiff decompensated quickly. *Id.* He was

22  experiencing delusions and auditory hallucinations, isolated himself, stopped taking care of his

---

[3] In 2009, Plaintiff was awarded Supplemental Security Income (SSI) disability benefits under Title XVI of the Social Security Act. AR at 520-519, 529. For the purposes of his Title XVI application, Plaintiff was found to be disabled, with an onset date of February 26, 2009, because his mental impairments caused marked difficulty maintaining attention and concentration, completing a workday, working with the public, and responding to changes. *Id.* Plaintiff was again found disabled in 2011, and his Title XVI benefits were continued. *Id.* at 529. The definition of disability under Titles II and XVI are identical. *See* 42 U.S.C § 423(d). Thus, in the instant application, the sole issue is whether Plaintiff's disability began prior to and persisted through 2005.

United States District Court
Northern District of California

1    basic needs and hygiene, and was "grossly preoccupied and confused." *Id.* at 863. Indeed, Plaintiff

2    "decompensated so precipitously" that his parents took him to see psychologist Dr. Gonzalez in

3    lieu of his sister, who was originally scheduled for an appointment. *Id.* at 1420, 1774.

4         Initially, to treat Plaintiff's psychotic symptoms, Dr. Gonzalez put Plaintiff on Risperdal.

5    *Id.* at 1420. Risperdal helped Plaintiff's auditory hallucinations, confusion, and racing thoughts,

6    but Plaintiff experienced significant side effects, and was put on Wellbutrin, and then, for similar

7    reasons, Plaintiff's prescription switched to Zyprexa. *Id.* By October 2001, three months after

8    Plaintiff's initial appointment, Dr. Gonzales reported that Plaintiff "was much more stable." *Id.* In

9    February 2002, Dr. Gonzales added a low dose of Prozac to Plaintiff's medications to assist with

10   "persistent depression." *Id.* Plaintiff's Prozac was twice increased in 2002, once to encourage

11   "improvement in mood," and once to address Plaintiff's "continued low energy." *Id.* Later that

12   year, after a period of stability, Plaintiff's Zyprexa dose was decreased, and by July 2002, Zyprexa

13   was discontinued entirely. *Id.* at 1421. Plaintiff remained on Prozac, although he indicated that he

14   would like to "taper off" his medications. *Id.* at 1421. In December of 2002, Plaintiff discontinued

15   Prozac to mitigate certain side effects. *Id.* at 764. He immediately decompensated, and Prozac was

16   reinitiated. *Id.*

17        Plaintiff was referred to Dr. Jones later that month. *Id.* Dr. Jones decided to continue

18   Prozac and add Geodon to Plaintiff's medications. *Id.* at 765-66. Dr. Jones reported that Plaintiff

19   was back in school but was "extremely lethargic," "lack[ed] motivation," and was "confused." *Id.*

20   at 765. Plaintiff "exhibited internal distraction," although "he denied any hallucinations." *Id.*

21   Plaintiff's "insight [was] nil, judgment [was] absent" and his "affect [was] one of depression." *Id.*

22        In January of 2003, Plaintiff had three appointments with Dr. Jones. *Id.* at 781-83. At the

23   first appointment, Dr. Jones noted that the Prozac-Geodon combination seemed to improve

24   Plaintiff's symptoms. *Id.* at 783. At his second appointment, on January 22, Plaintiff was "actively

25   hallucinating and delusional, talking to Jesus and seeing things in the mirror." *Id.* at 782. Dr. Jones

26   changed Plaintiff's diagnosis from depression with psychotic features to schizophrenic reaction,

27   paranoid type, and began to increase Plaintiff's dose of Geodon and decrease his Prozac dose. *Id.*

28   Plaintiff's next appointment with Dr. Jones, on January 29, was relatively unremarkable. *Id.* at

781. Dr. Jones's indicated only that Plaintiff was taking Zyprexa and Prozac, that they "discussed Plaintiff's religious views," and that Dr. Jones encouraged Plaintiff's parents to do the same. *Id.* Dr. Jones also increased Plaintiff's Zyprexa dose. *Id.*

In February of 2003, Plaintiff's symptoms were similarly irregular. On February 5, Dr. Jones noted "slight improvement." *Id.* at 780. Plaintiff was "playing more than one game on the computer," had invited a friend over, was able to notice what was playing on the television and had gone out to eat. *Id.* "In these respects," Dr. Jones wrote, "he seems somewhat improved." *Id.* The next week, Plaintiff decompensated again. *Id.* at 779. Plaintiff refused to take his medication and was "forwardly psychotic." *Id.* Dr. Jones discussed hospitalization with Plaintiff's parents, but they "wanted to try for another week to get him to take his medication." *Id.* Plaintiff's parents were apparently successful; the next week Dr. Jones reported that Plaintiff was on Abilify and was "taking a little more interest in his surroundings, smiling a bit, and seem[ed]…less internally distracted." *Id.* at 777.

From March to May 2003, Plaintiff was relatively stable. *See id.* at 776 (March 2003, Dr. Jones notes "remarkable improvement" on Abilify, though Plaintiff's energy is "still obtunded some"); *id.* at 777 (April 2003, Plaintiff "has improved" on Abilify, "although he is still very lethargic, hesitate[s] to talk freely, and extremely shy."); *id.* at 775 (May 2003, Plaintiff is doing well, applying for school, taking Abilify and Prozac, made contact with a girl, reaching out to friends."). In the summer of 2003, Plaintiff took one summer school course, English, and earned a B in the class. *Id.* at 774, 772. Plaintiff's appointments with Dr. Jones continued to demonstrate relative stability through November 2003. *See id.* (July 2003 appointment, Plaintiff is "brought in by parents," doing "quite well," taking Prozac and Abilify); *id.* at 772 (August 2003 appointment, Plaintiff "comes in with parents" and is "markedly improved…back in school, taking four subjects."); *id.* at 771 (At November 2003 appointment Plaintiff "comes in today with his parents," is doing "quite well," and although "he had to drop a history class," he was doing well in his other courses.).

In December of 2003, Plaintiff expressed a desire to get off Abilify. *Id.* at 770. At this point, Plaintiff had been off Prozac for about two months. *Id.* Against Dr. Jones's advice, Plaintiff

1   stopped taking his medication. *Id.* at 770, 769. By February 2004, Plaintiff had ceased taking all

2   medications for two months and appeared to have "no return of psychotic symptoms." *Id.* at 769.

3   Plaintiff "made good grades" and was, at the time, signed up for 15 credit hours of coursework. *Id.*

4   Dr. Jones decided to continue without medications "for the time being." *Id.* However, at Plaintiff's

5   next appointment, Plaintiff was back on Abilify. *Id.* at 768. Dr. Jones reported that Plaintiff was

6   "doing quite excellently" and that Plaintiff "showed a lack of motivation and was quite lethargic

7   when not taking his Abilify." *Id.*

8         Plaintiff began treatment by Dr. Jacisin in May 2004, and continued to see Dr. Jacisin

9   through his 22nd birthday in October 2005. *See id.* at 791-97. Dr. Jacisin diagnosed Plaintiff with

10   Major Depression, recurrent with psychotic features and Social Anxiety Disorder. *Id.* at 784. Dr.

11   Jacisin's treatment notes are difficult to read, but, as the ALJ noted in his decision, there seems to

12   be frequent discussion of the side effects of Plaintiff's medications. *See id.* at 791-797. One can

13   also discern several statements referring to Plaintiff's complaints of grogginess in 2005 (*See id.* at

14   793, 794) as well as indications that Plaintiff was doing well in school (*See id.* at 795, 792).

15   Plaintiff largely remained on Abilify during this time, though he also tried Lexapro. *Id.* at 786,

16   791.

17         Since his 22nd birthday, Plaintiff has been hospitalized three times. *Id.* at 503, 529-30,

18   864, 1413. Relevant to the current application for DAC benefits, Plaintiff was evaluated by a

19   Social Security Administration ("SSA") consultative examiner, Dr. Patrick Wong, in April of

20   2009. *Id.* at 863-866. Dr. Wong's report confirmed Plaintiff's symptoms during his psychotic

21   episodes included entering a "vegetative state" with long periods of time spent staring into a

22   mirror, visual and auditory hallucinations, "hyperreligiosity…restlessness, hyperactivity, a

23   decreased need for sleep, and hysterical laughing." *Id.* at 864. Based on Plaintiff's medical

24   records, Dr. Wong was surprised that Plaintiff had not been hospitalized prior to 2008. *Id.* Dr.

25   Wong noted that Plaintiff "probably harbors psychotic beliefs but has learned to minimize the

26   expression of them." *Id.* at 866; *see also id.* at 865 (Although Plaintiff "denies actively

27   hallucinating," Dr. Wong "wouldn't be surprised, based on [Plaintiff's] general behavior, that

28   [hallucinations] were present."); *and id.* (Reality testing was "somewhat suspect" as Plaintiff

United States District Court
Northern District of California

"seems to know the right things to say."). Dr. Wong further noted that Plaintiff's success in school was due to the "fairly low stress environment…where [Plaintiff was] taking a minimum [number] of easy classes…and [was] watched over carefully by his parents." *Id.* Even with this support, Dr. Wong reported, Plaintiff was "just marginally stable." *Id.*

A. *Relevant Hearing Testimony*

As mentioned above, Plaintiff attended administrative hearings in 2016, 2019, and 2022. Because the parties' dispute turns, in part, on whether testimony provided at these hearings should be credited as true, a summary of the relevant testimony follows.

Plaintiff and his mother, a registered nurse, confirmed that Plaintiff's mental health symptoms began in 2001 between his junior and senior years of high school. *Id.* at 501, 1773. As a result, Plaintiff was homeschooled for the first half of his senior year. *Id.* Plaintiff returned to school for the second semester of his senior year and graduated in 2002. *Id.* To graduate, Plaintiff had to drop his advanced placement classes and his GPA declined. *Id.* Plaintiff stated that his symptoms in 2001 included extreme depression, inability to eat, loss of sleep, racing thoughts, hearing voices, and difficulty focusing and concentrating. *Id.* at 502. Plaintiff's mother ("Mrs. B") also corroborated the events of August 2001, noting Plaintiff's rapid decompensation included frequent pacing and complaining of voices that were "cursing," as well as extreme weight loss and insomnia. *Id.* at 1773, 1776.

As is reflected in Plaintiff's medical records, Plaintiff began seeing Dr. Gonzalez in August of 2001, and was prescribed medication as detailed above. *Id.* at 501, 1773. Both Plaintiff and his mother testified that Dr. Gonzales recommended Plaintiff be hospitalized, but Plaintiff's parents decided to keep him home. *Id.* at 512, 1774. After graduating from high school, Plaintiff attended San Joaquin Delta College ("Delta College"). *Id.* at 504. He graduated from Delta college in 2006. *Id.* at 504, 1764. It took him four years to obtain his associate degree in liberal arts. *Id.* Plaintiff then transferred to Stanislaus State, where he took another four years to obtain his bachelor's degree in music. *Id.* at 504-05.

According to both Plaintiff and his mother, Plaintiff's medications and therapy did alleviate his symptoms to some degree. *See id.* at 503, 1776. However, even when medicated,

Plaintiff still felt "flat," "depressed," and "in a fog." *Id.* at 503. Plaintiff testified that on a "monthly basis," he would be "unmotivated, flat, unable to do anything useful." *Id.* at 507. These periods, which would last "weeks at a time" were usually triggered by stress at school, as he "didn't have anything else going at that time." *Id.* at 507-08.  Plaintiff would "miss school because of [his] illness," and often had to drop classes. *Id.* He "hardly drove [himself] anywhere" and when he did, was usually accompanied by his mother or father. *Id.* at 508-09. Although Plaintiff did go out with friends and family, when he felt unmotivated or flat, he isolated. *Id.* at 509. Plaintiff reported that, he "was withdrawn…couldn't really talk about [his] symptoms to [his] friends" and felt isolated as a result. *Id.* at 1767. Mrs. B reported similar symptoms. When asked what Plaintiff was like when he was "at his best" during the relevant period, Mrs. B reported that he "appeared cool or flat," "isolated a lot," was very fatigued and wouldn't "initiate conversation…he just seemed to live in his head." *Id.* at 1777-78.

Both Plaintiff and his mother reported difficulty sleeping and extreme fatigue. *Id.* at 1767-68, 1776. According to Plaintiff, he would often take naps during the day and felt "low energy and low motivation" daily. *Id.* at 1767-68. He "couldn't find enjoyment in anything," and would take frequent naps because he "felt really fatigued." *Id.* Similarly, Mrs. B stated that Plaintiff took a nap every day, would sleep in the car on the way to school, "always appeared hungover," and, when he went to school on the bus, would sometimes sit in the school lounge, sleep, and not attend class. *Id.* at 1776-77.

Plaintiff has always lived with his parents and has relied heavily on them for support. His mother drove him to school "every day" because he was "fatigued and felt anxious about driving." *Id.* at 506, 1766. Mrs. B also helped Plaintiff with his medications and took him to his doctor's appointments. *Id.* at 508. She switched to working only on weekends, when Plaintiff's father could watch him, so that she could be home with Plaintiff during the week. *Id.* at 1776. She was with Plaintiff "all day" and felt she "couldn't leave [Plaintiff] alone." *Id.*; *see also id.* at 1768 (Plaintiff's testimony to the same effect).

Mrs. B elaborated on Plaintiff's experience at Delta College. *See id.* at 1778-79. She explained that Plaintiff had to sign up for full time classes for insurance purposes, but there were

many times when he was overwhelmed, and he had to reduce his courseload or switch to easier classes. *Id.* Mrs. B noted that, as a child, Plaintiff did not need help with school, but after the onset of his symptoms in 2001, she was very involved in his education. *Id.* at 1778. She testified that she used flashcards with Plaintiff, read and reviewed the material with him, and learned the material to help him get through his classes. *Id.* She noted that there were many days when Plaintiff didn't make it to school at all. *Id.* at 1779. Plaintiff also testified that while he was in school, he had difficulties with his course load because of his symptoms. *Id.* at 505. Plaintiff missed class and needed to take breaks, and "there were times [he] had to drop out completely." *Id.* at 505. Plaintiff stated that he had class only two to three days a week. *Id.* at 1771. Even so, he estimated that he missed two or three days of school per month. *Id.*

Finally, Plaintiff's testimony suggests that he could not or did not speak to his psychologists about the full extent of his symptoms during the relevant period. *See id.* at 1786. When asked whether he tried to hide that he was hearing voices, Plaintiff said that he "couldn't vocalize what was going on in his head." *See id.* at 1768-79. He also testified that he wasn't aware of how "deep of a hole" he was in (*id.* at 503), had a difficult time understanding his illness, and was dismissive of his doctors (*id.* at 1768).

At the 2022 hearing, the ALJ did not question Plaintiff or his mother, but did question Mr. John Yost, plaintiff's long-time therapist and a licensed clinical social worker. *Id. at* 2415-39. Mr. Yost testified that he began seeing Plaintiff in 2001 on referral from Plaintiff's psychiatrist, Dr. Gonzalez. *Id.* at 2423. At the time of the hearing, Mr. Yost had been seeing Plaintiff "on and off since he was 17…almost 21 years now." *Id.* When Plaintiff "regress[ed] or relapse[d] in his psychosis," Plaintiff visited Mr. Yost weekly, sometimes twice a week. *Id.* When Plaintiff was "a bit more stable," Plaintiff visited Mr. Yost every other week. *Id.* Plaintiff saw Mr. Yost for the entire relevant period—from 2001 to 2005. *Id.* at 2423-24.

Mr. Yost reported that Plaintiff's medications had a "stabilizing effect." *Id.* at 2424. Initially, Plaintiff went on and off his medications, which, Mr. Yost stated, was "typical for someone [of Plaintiff's age] with a psychotic disorder." *Id.* Mr. Yost attributed Plaintiff's

9

resistance to medication to the "degree of denial" that young patients often feel and their "struggl[e] with coming to terms with" a lifelong diagnosis. *Id.*

When asked about Plaintiff's behavior while taking his medication, Mr. Yost testified that Plaintiff stabilized, but that his symptoms would "always include sleep disturbance, at times agitation, at times…hallucinating or hearing voices" and that "focus and concentration…were always an issue." *Id.* at 2425. Mr. Yost further testified that Plaintiff would "sleep better…be more receptive to daily living expectations [including] hygiene and [] eating behavior" and that, although Plaintiff's auditory hallucinations decreased, Mr. Yost wasn't sure if, "for the first ten years or more of [Plaintiff's] illness…those voices ever went away." *Id.* Rather, Mr. Yost suspected that "the volume just turned down, and his agitated, almost manic-like behaviors decreased." *Id.*

Regarding Plaintiff's education, Mr. Yost testified that Plaintiff was homeschooled during his senior year of high school, that he attended Delta College and Stanislaus State "off and on," that he took "eight maybe ten years" to get his degrees, and that this extended period of time was due in part to Plaintiff's mental illness. *Id.* at 2426-28 (Plaintiff took time off school because of the "reemergence of the symptoms with his mental illness" or because "he wasn't able to focus and concentrate and be a student."); *see also id.* at 2431 (Plaintiff, while on medication, still "struggl[ed] with just the ability to sit and produce academic work."); *id.* at 2432 (Plaintiff "tolerated school in just small bites."); *id.* at 2433 (Plaintiff, at times, had "meltdowns" where "he would leave the classroom and experience high anxiety in the hallway").

Regarding Plaintiff's activities outside of school, Mr. Yost testified that Plaintiff was "not going out almost ever" and "didn't get his driver's license until his late twenties I think." *Id.* at 2429. Mr. Yost noted that Plaintiff "always had a church group, but at that point…hadn't quite established regular attendance." *Id.* Further, Plaintiff had "almost no friends from high school," was "pretty isolated at home," "wasn't going to stores" and "wasn't driving." *Id.* Plaintiff's parents "provided transportation" to and from school. *Id.* Overall, Mr. Yost reported that Plaintiff "wasn't showing up as…a typical 18, early twenties [adult] as far as engagement." *Id.* at 2429.

1     Mr. Yost confirmed that Plaintiff received significant support from his parents, noting that

2 "there were several instances…when [Plaintiff] could have been psychiatrically hospitalized and

3 he was not." *Id.* at 2430.  Mr. Yost attributed this to Plaintiff's parents, noting that both of

4 Plaintiff's parents were "incredibly supportive" and "kept him home[,] followed the doctor's

5 description, managed the meds," and, as a result, Plaintiff "was saved from a number of times

6 when he could have been psychiatrically hospitalized." *Id.*

7        **THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

8     A person filing a claim for social security disability benefits ("the claimant") must show

9 that he has the "inability to do any substantial gainful activity by reason of any medically

10 determinable impairment" which has lasted or is expected to last for twelve or more months. *See*

11 20 C.F.R. §§ 416.905(a), 416.909. The ALJ must consider all evidence in the claimant's case

12 record to determine disability (*see id.* at § 416.920(a)(3)) and must use a five-step sequential

13 evaluation process to determine whether the claimant is disabled. *Id.* at § 416.920; *see also id.* at §

14 404.1520. While the claimant bears the burden of proof at steps one through four (*see Ford v.*

15 *Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020)), "the ALJ has a special duty to fully and fairly develop

16 the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d

17 441, 443 (9th Cir. 1983). Here, the ALJ appropriately set forth the applicable law regarding the

18 required five-step sequential evaluation process. AR at 2381-83.

19     At step one, the ALJ must determine if the claimant is presently engaged in "substantial

20 gainful activity" (20 C.F.R. § 404.1520(a)(4)(i)), which is defined as work done for pay or profit

21 and involving significant mental or physical activities. *See Ford*, 950 F.3d at 1148. Here, the ALJ

22 determined that Plaintiff had not performed substantial gainful activity during the relevant period.

23 AR at 2383.

24     At step two, the ALJ decides whether the claimant's impairment (or combination of

25 impairments) is "severe" (*see* 20 C.F.R. § 404.1520(a)(4)(ii)), "meaning that it significantly limits

26 the claimant's 'physical or mental ability to do basic work activities.'" *Ford*, 950 F.3d at 1148

27 (quoting 20 C.F.R. § 404.1522(a)). If no severe impairment is found, the claimant will not be

28 found to be disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the

United States District Court
Northern District of California

11

1    severe impairments of bipolar disorder and schizoaffective disorder. AR at 2384.

2        At step three, the ALJ is tasked with evaluating whether the claimant has an impairment or

3    combination of impairments that meet or equal an impairment in the "Listing of Impairments." *See*

4    20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1. The listings describe

5    impairments that are considered sufficiently severe as to prevent any individual so afflicted from

6    performing any gainful activity. *Id.* at § 404.1525(a). Each impairment is described in terms of

7    "the objective medical and other findings needed to satisfy the criteria in that listing." *Id.* at §

8    404.1525(c)(3). For a claimant to show that his or her impairment matches a listing, it must meet

9    all the specified medical criteria—an impairment that manifests only some of those criteria, no

10   matter how severely, does not "meet" that listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530

11   (1990). If an impairment either meets the listed criteria, or if one or more impairments are

12   determined to be medically equivalent to the severity of that set of criteria, that person is

13   conclusively presumed to be disabled without a consideration of age, education, or work

14   experience. *See* 20 C.F.R. § 404.1520(d). Here, the ALJ determined that Plaintiff did not have an

15   impairment or combination of impairments that meets or equals the criteria or severity of any of

16   the listings. AR at 2384.

17       If a claimant does not meet or equal a listing, the ALJ must formulate the claimant's

18   residual functional capacity ("RFC"), which is defined as the most that a person can still do

19   despite the limitations associated with their impairment. *See* 20 C.F.R. § 404.1545(a)(1). Here, the

20   ALJ determined that Plaintiff, prior to age 22, could perform a full range of work at all exertional

21   levels but with the following non-exertional limitations: Plaintiff was limited to "understanding,

22   remembering, and carrying out simple routine, repetitive tasks" and "using judgment limited to

23   simple work-related decisions." AR at 2385. The ALJ also found that Plaintiff was "socially

24   capable of interacting appropriately with supervisors, coworkers, and the public occasionally." *Id.*

25       Following the formulation of the RFC, the ALJ must determine—at step four—whether the

26   claimant can perform his past relevant work, which is defined as "work that [the claimant has]

27   done within the past 15 years, that was substantial gainful activity, and that lasted long enough for

28   [the claimant] to learn to do it." *See* 20 C.F.R. § 404.1560(b)(1). If the ALJ determines, based on

United States District Court
Northern District of California

12

the RFC, that the claimant can perform his past relevant work, the claimant will not be found disabled. *Id.* at § 404.1520(f). Otherwise, at step five, the burden shifts to the agency to prove that the claimant can perform a significant number of jobs that are available in the national economy. *See Ford*, 950 F.3d at 1149. To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines (commonly referred to as "the grids") (20 C.F.R. Pt. 404 Subpt. P, App. 2); or, alternatively, the ALJ may rely on the testimony of a Vocational Expert ("VE"). *Ford*, 950 F.3d at 1149 (citation omitted). A VE may offer expert opinion testimony in response to hypothetical questions about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy, or the demands of other jobs that may be available in the national economy. *See* 20 C.F.R. § 404.1560(b)(1). An ALJ may also use other resources for this purpose, such as the Dictionary of Occupational Titles ("DOT"). *Id.*

At step four, the ALJ determined that Plaintiff had no past relevant work. AR at 2402. At step five, based on a VE's testimony, the ALJ determined that Plaintiff could perform the requirements of representative occupations such as an industrial cleaner, kitchen helper, and a laundry worker. *Id.* at 2403. Accordingly, the ALJ determined that Plaintiff was not disabled at any time during the relevant period. *Id.* at 30.

## DISCUSSION

The Commissioner argues that further proceedings are necessary to determine whether, and to what extent, Plaintiff's psychological disorders are controlled with medication. Def.'s Mot. (Dkt. 22) at 3. Specifically, the Commissioner points to Plaintiff's graduation from Delta College with an associate of arts degree in 2006 and other "improvement as documented in the record" as evidence that some ambiguity exists surrounding the extent of Plaintiff's improvement with treatment. *Id.* Plaintiff argues that further administrative proceedings would be futile, and that were the evidence, improperly rejected by the ALJ, credited as true, a finding of disability would necessarily result. *See* Pl.'s Reply (Dkt 24) at 2-5.

Ordinarily, when an ALJ "denies benefits and the court finds legal error," remand to the

United States District Court
Northern District of California

United States District Court
Northern District of California

agency for further proceedings is the appropriate remedy. *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). However, the court has discretion to grant a "direct award of benefits when certain conditions are met." *Id.* (citing *Varney v. Sec. Health & Hum. Servs.*, 859 F.2d 1396, 1400-01 (9th Cir. 1988)). To find that a direct award of benefits is warranted, the court must engage in a three-part analysis known as the "credit-as-true" rule. *Id.* (citing *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014). The first step of the credit-as-true analysis is to determine "whether the ALJ failed to provide legally sufficient reasons for rejecting evidence." *Id.* Next, the court considers "whether there are outstanding issues that must be resolved before a disability determination can be made, and whether further administrative proceedings would be useful." *Id.* (citing *Treichler*, 775 F.3d at 1101, and *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004)) (internal quotations omitted). If there are no outstanding issues and further proceedings would be futile, the court credits the improperly rejected evidence as true and decides, considering the whole record, whether there is any "doubt as to disability." *Id.*; *see also Garrison*, 759 F. 3d at 1021-23 (9th Cir. 2014) (holding that when the conditions of the credit-as-true rule are satisfied, and a careful review of the record discloses no reason to seriously doubt that a claimant is, in fact, disabled, a remand for calculation and award of benefits is required).

### A. The ALJ's Legal Errors

Although the parties agree that the ALJ's decision was not supported by substantial evidence, the Commissioner does not concede specific errors except to say that Plaintiff "may not have improved to the degree that the ALJ found." Def.'s Mot. (Dkt. 22) at 4. For his part, Plaintiff submits three primary errors made by the ALJ that the court will address: first, although the ALJ gave the opinion of Dr. Wong "great weight" he did not credit all of Dr. Wong's opinion in his formulation of Plaintiff's RFC;[4] second, the ALJ discredited Plaintiff's pain and symptom testimony without stating specific, clear and convincing reasons for doing so; and third, the ALJ failed to provide germane reasons for dismissing Mrs. B's lay testimony and the testimony of

---

[4] It appears that this may be the error the Commissioner concedes, though it is not entirely clear from the Commissioner's briefing. *See id.* at 4.

Plaintiff's treating therapist, Mr. Yost. *See generally* Pl.'s Mot. (Dkt. 17). For the reasons stated below, the court agrees with Plaintiff, and finds that the ALJ erred in his application of Dr. Wong's medical opinion and his evaluation of Plaintiff's testimony, Mrs. B's testimony, and Mr. Yost's testimony.[5]

### 1. *Dr. Wong's Medical Opinion*

The ALJ accorded "great weight" to the opinion of Dr. Wong, noting that Dr. Wong "reviewed the complete documentary record and provided a detailed explanation with references to the evidence in the record to support [his] opinion" and that Dr. Wong was a "specialist" familiar with "Social Security policy and regulations." AR at 2395. This is the third time that Dr. Wong's opinion has been afforded great weight. *See id* at 25 (ALJ's 2019 opinion); *id.* at 2395 (ALJ's 2022 opinion); *and A.B. v. Saul*, 2021 WL 2817166 at *4. Upon formulation of Plaintiff's RFC, however, the ALJ did not include the functional limitations, expressed by Dr. Wong, that Plaintiff's "ability to maintain adequate pace is at least moderately impaired at baseline"; that Plaintiff was "likely to have his more severe psychosis easily retriggered by additional stress"; that, for Plaintiff, "the probability of functional deterioration due to typical workplace stressors [was] very, very high"; and that Plaintiff's "ability to adapt to a competitive work setting [was] limited." *Compare id.* at 866 with *id.* at 2395.

Further, the ALJ did not consider Dr. Wong's opinions when assessing Plaintiff's symptom testimony and the lay witness reports of Plaintiff's mother and treating therapist. *See generally id.* at 2393-2402. If he had, he would have found that Dr. Wong's report corroborates their testimony about the persistence of Plaintiff's symptoms while taking medication. This is

---

[5] The credit-as-true analysis applies to lay witness opinions as well as medical opinions, other medical source opinions, and the claimant's testimony. *See, McCann v. Colvin*, 111 F. Supp. 3d 116, n. 4 ("[T]he court sees no reason why the [credit-as-true] rule should not apply with equal force to the opinions of lay witnesses[.]") (citing *Strauss v. Comm'r Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2008)); *see also e.g.*, *J.M. v. Saul*, No. 19-cv-04908, 2021 WL 858369, (N.D. Cal. March 7, 2021) (applying the credit as true analysis to lay witness testimony, along with medical opinions and claimant testimony, to hold that direct award of benefits was appropriate); *George C.L. v. Saul*, No. 20-cv-08232-RMI, 2022 WL 836301 (N.D. Cal. March 21, 2022) (relying on lay witness testimony, credited as true, to find that remand for the immediate calculation of benefits was appropriate); *Andrus-Karker v. Colvin*, No. 6:13-cv-02134-PK, 2015 WL 3508990, (D. Or. June 2, 2015) (applying the credit-as-true analysis to lay witness testimony and other medical sources).

United States District Court
Northern District of California

discussed more thoroughly below, but here, the court notes that particularly relevant are Dr. Wong's assessments that Plaintiff "probably harbors psychotic beliefs but has learned to minimize the expression of them" and that Plaintiff was "just marginally stable" despite being on medication, taking an easy courseload, and being "carefully watched over by his parents." *Id.* at 866.

The ALJ cannot, after affording Dr. Wong's opinion great weight, select only those portions of Dr. Wong's opinion the ALJ finds amenable to a finding of non-disability, while ignoring those portions that are incompatible with such a finding, especially without providing any explanation for disregarding portions of an otherwise persuasive opinion. *See Lizer v. Berryhill*, 363 F. Supp. 3d 1097, 1101 (N.D. Cal. 2019). The court finds Dr. Wong's opinion was properly afforded great weight—the ALJ erred, however, when he failed to credit it in full.

2.   *Plaintiff's Symptom Testimony*

When assessing a claimant's testimony regarding the subjective intensity, persistence, and limiting effects of their symptoms, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, the ALJ must determine if there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the symptoms alleged." *Id.* (internal quotations omitted). If the first test is met, "and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Garrison*, 759 F.3d at 1015 (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) and *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)) (internal quotations omitted). This is not an easy standard to meet; "[t]he clear and convincing standard is the most demanding required in Social Security Cases." *Id.* (citing *Moore v. Comm'r Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

Here, The ALJ found that Plaintiff's symptoms could reasonably be attributed to his bipolar and schizoaffective disorders, both of which were supported by objective medical evidence. AR at 2386. The ALJ made no finding of malingering and as such, was required to give "specific, clear and convincing reasons" for dismissing Plaintiff's testimony about the severity of

16

1    his symptoms. Pointing to treatment notes from Dr. Gonzales, Dr. Jones, and Dr. Jacisin, which

2    the court has outlined above, the ALJ found that there was "no indication of any serious

3    exacerbations from March 2003 to attainment of age 22." *Id.* at 2394. The ALJ noted that Dr.

4    Jacisin assigned Plaintiff a GAF score of 75 and that Plaintiff "was thereafter seen for relatively

5    routine follow up" through his 22nd birthday. *Id.* The ALJ then dismissed Plaintiff's testimony

6    that he drove very little, dropped classes because he felt overwhelmed by the courseload, had

7    stuttering issues while on the phone, had trouble maintaining relationships, felt isolated, could not

8    find enjoyment in things, took frequent naps due to fatigue, thought that an increase in stress or

9    responsibilities would have exacerbated his symptoms, and missed many days of school due to his

10   symptoms. *Id.*

11           An ALJ must perform a careful analysis when considering a mental health patient's

12   improvement with medication. *See Garrison*, 759 F.3d at 1017. "Reports of 'improvement' in the

13   context of mental health issues must be interpreted with an understanding of the patient's overall

14   well-being and the nature of [his] symptoms." *Id.* (citing *Ryan v. Comm'r Soc. Sec.*, 528 F.3d

15   1194, 1201 (9th Cir. 2008)); *see also Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)

16   ("The [treating physician's] statements must be read in context of the overall diagnostic picture

17   [he or she] draws. That a person who suffers from severe panic attacks, anxiety, and depression

18   makes some improvement does not mean that the person's impairments no longer seriously affect

19   [his] ability to function in a workplace.") Further, notes of improvement must be interpreted "with

20   an awareness that improved functioning while being treated and while limiting environmental

21   stressors does not always mean that a claimant can function effectively in a workplace." *Garrison*,

22   759 F.3d at 1017 (citing *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011) (noting that there

23   can be a "great distance between a patient who responds to treatment and one who is able to enter

24   the workforce") and *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("[D]oing well for

25   the purposes of a treatment program has no necessary relation to a claimant's ability to work or to

26   her work-related functional capacity.")).

27           There is no doubt that Plaintiff's schizoaffective and bipolar disorders manifested in 2001

28   with symptoms of severe psychosis. *See e.g.*, *id.* at 863, 1413, 2363, 1420, 1774 (describing

United States District Court
Northern District of California

17

1    Plaintiff's symptoms including auditory hallucinations, pacing, talking to Jesus, racing thoughts,

2    loss of appetite, insomnia, etc.). From 2001 to 2005, the medical record is clear that when Plaintiff

3    decompensated, his symptoms were similarly extreme. *See e.g.*, *id.* at 782, 864-866. Thus,

4    notations of "improvement" in the context of the severity of Plaintiff's symptoms are not

5    inconsistent with Plaintiff's testimony that, when on his medications, he felt flat and depressed,

6    was fatigued, took frequent naps, experienced social anxiety and isolation, missed school, and was

7    overwhelmed by his coursework. To the contrary, these statements are consistent with the

8    treatment notes cited by the ALJ, which, alongside acknowledgements of improvement, indicate

9    Plaintiff experienced depression, fatigue, and grogginess, (s*ee id.* at 765, 768, 777, 793, 794),

10   almost always demonstrate that Plaintiff's parents drove him to and attended his appointments (*see*

11   *e.g.*, *id.* at 771, 772, 774, 788), characterize his improvement as inviting over a friend, and playing

12   more than one game on the computer (*see e.g.*, *id.* at 780), and note that despite doing well,

13   Plaintiff had to drop classes (*see e.g.*, *id.* at 771). Dr. Wong's report is similarly consistent with

14   Plaintiff's testimony. *See e.g, id.* at 866 (noting that Plaintiff, who was taking Abilify at the time,

15   was "variably attentive, but with much effort expended," that "attention was inconsistent," that

16   Plaintiff's "emotional tone" and "affect [were] blunted," and that Plaintiff was "likely to have his

17   more severe psychosis easily retriggered by work stress"). Plaintiff's social isolation and anxiety

18   are also supported by the medical record (*see e.g.*, *id.* at 784 (diagnosis of social anxiety

19   disorder)), and his difficulty with school is supported by his transcripts, which demonstrate that he

20   repeatedly dropped from full- to half-time and took over four years to obtain a two-year degree

21   (*id.* at 20-24, 760-61). Plaintiff's symptoms are further corroborated by the third-party testimony

22   of his mother and treating therapist, John Yost, both of whom describe Plaintiff as struggling with

23   depression, fatigue, and anxiety while on his medications. *See generally id.* at 1772-79, 2423-33.

24           Further, given Dr. Wong's observations that Plaintiff likely hid the extent of his psychosis

25   (*id.* at 865, 866), Plaintiff's own statements to that effect (*id.* at 1768), and similar observations by

26   Plaintiff's treating therapist (*id.* at 2426), there is significant evidence in the record to suggest that

27   Plaintiff was not entirely forthcoming with his doctors during the relevant period. In this context,

28   notes of improvement are even less probative than they would otherwise be.

1      There is no dispute that Plaintiff improved with medication. Neither Plaintiff, nor his

2   mother, nor any of his physicians disagree on this point. Plaintiff's improvement, however, is

3   relative to his decompensation. Plaintiff's statements that he experienced depression, fatigue, and

4   anxiety while on his medications are entirely consistent with his physicians' reports detailing

5   improvement—in fact, the treatment notes on which the ALJ relies to discredit Plaintiff's

6   testimony do much to substantiate Plaintiff's account, as does the whole of Plaintiff's medical

7   record. Accordingly, the court finds that the ALJ failed to give "specific, clear and convincing"

8   reasons to discredit Plaintiff's testimony.

9          3.   *Lay Witness Testimony of Mrs. B*

10      An ALJ must also consider the testimony of "non-medical sources," or lay witnesses, when

11   assessing the severity of a claimant's symptoms.  *Stout v. Comm'r Soc. Sec.*, 454 F.3d 1050 (9th

12   Cir. 2006). "Lay testimony as to a claimant's symptoms or how an impairment affects ability to

13   work *is* competent evidence…and therefore *cannot* be disregarded without comment." *Id.* (quoting

14   *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis in original). Thus, an ALJ must

15   give germane reasons for discounting the testimony of lay witnesses. *Id.* (citing *Dodrill v. Shalala*,

16   12 F.3d 915, 919 (9th Cir. 1993)).

17      Here, the ALJ afforded "reduced weight" to Mrs. B's testimony because it was not

18   supported by the "overall evidence." *Id.* at 2401-02. To reach this conclusion, the ALJ pointed to

19   the same treatment notes he relied on to dismiss Plaintiff's testimony and asserted that Mrs. B's

20   descriptions of Plaintiff's symptoms were not consistent with Plaintiff's improvement as

21   documented in the record. *Id.* Consequently, the ALJ dismissed Mrs. B's testimony that Plaintiff

22   would have been unable to live alone prior to age 22, was depressed and unable to understand his

23   condition, was anxious most of the time, appeared "cool or flat," isolated a lot, took daily naps,

24   did not initiate conversation, had trouble answering questions on the phone, would take the bus to

25   school and then not go to class, and missed class a lot. *Id.* The ALJ also dismissed testimony that

26   Mrs. B assisted Plaintiff with coursework.

27      The court need not belabor the point—Plaintiff's treatment notes from Drs. Gonzalez,

28   Jones, and Jacisin indicating "improvement" are not in conflict with descriptions of Plaintiff's

19

affect while on medication as depressed, anxious, and fatigued for the reasons discussed above. The court recognizes that the "germane" standard is not as rigorous as the "clear and convincing" standard—however, inconsistency with Plaintiff's treatment notes meets neither standard, for no actual inconsistency exists. *See Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1164 (9th Cir. 2012) (finding remand appropriate where "[t]he Commissioner's proffered inconsistencies are simply not inconsistent."). Thus, the ALJ erred when he afforded reduced weight to Mrs. B's testimony.

Indeed, contrary to the ALJ's conclusion that Mrs. B's testimony was inconsistent with the "overall record," her testimony is consistent with medical reports, Plaintiff's testimony, and with Plaintiff's treating therapist's testimony. Mrs. B's testimony that she assisted him with school, changed her working hours so that one parent was always home with Plaintiff, drove him everywhere, and that Plaintiff could not have lived alone at the time, is confirmed by evidence throughout the record that Plaintiff's success—namely, graduating from college and staying out of the hospital—is due in large part to the immense support of his parents and the structured environment they provided. *See e.g.*, AR at 779 (Dr. Jones' detailing in 2003 that he "discussed with parents [sic] options as far as hospitalization" but that they "want to try for another week or two to get him to take his medication"); *id.* at 788 (Dr. Jacisin noting in 2004 that Plaintiff is "seen today with his parents, [who] seem very involved in his care"); AR at 865-866 (Dr. Wong noting in 2009 that Plaintiff is "just marginally stable" despite the "fairly low stress environment he is in now, where he is taking a minimum [number] of easy classes…and watched over very carefully by his parents[.]"); *id.* at 864 (Dr. Wong noting that Plaintiff's 2008 hospitalization was "surprisingly" his first). Plaintiff's mother's testimony regarding the support she and Plaintiff's father provided is further corroborated by Plaintiff's own statements (*see id.* at 1768) as well as the lay testimony of Plaintiff's therapist (*see id.* at 2430).

Far from being inconsistent with the record, Plaintiff's mother's testimony is of particular value, as it is clear from the evidence—both medical and testimonial—that she observed and cared for Plaintiff nearly every day for the entire relevant period. The importance of such lay testimony has been repeatedly recognized by the Ninth Circuit and the SSA. *See e.g.*, *Smolen*, 80 F.3d at

20

1288-89; *Regennitter v. Comm'r Soc. Sec.*, 166 F.3d 1294, 1298 (9th Cir. 1999) (finding that the

plaintiff's mother's testimony was an "important source of information" where it "corroborated

every aspect" of the plaintiff's testimony); 20 C.F.R. § 404.1529 (The information provided by

nonmedical sources "is an important indicator of the intensity and persistence of [the claimant's]

symptoms" and will be "carefully consider[ed]."); 20 C.F.R § 404.1527(f)(1) (establishing that

opinions from nonmedical sources can outweigh opinions of medical sources, where, for example,

the nonmedical source spends more time with the claimant and supports their opinion with

evidence that is more consistent with the record).[6] Thus, because Plaintiff's mother's testimony is

consistent with the medical record and lay testimony, corroborates Plaintiff's own accounts of his

symptoms, and does not conflict with treatment notes indicating Plaintiff's improvement, the court

finds that the ALJ failed to provide germane reasons for dismissing her testimony as to Plaintiff's

symptoms while on medication and the supporting role she played in his daily life.

    4. *Other Source Testimony of John Yost*

        Mr. Yost is a licensed clinical social worker and as such, is not an "acceptable medical

source." 20 C.F.R § 4041513(d). Thus, the ALJ had to provide germane reasons to dismiss his

testimony regarding the severity, persistence, and limiting effects of Plaintiff's symptoms. *Turner

v. Comm'r Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (citing *Lewis v. Apfel*, 236 F.3d 503,

511 (9th Cir. 2001)). Here, the ALJ provided several reasons to dismiss Mr. Yost's testimony

which can be grouped into the following categories: (1) that Mr. Yost's opinion was "retrospective

and rendered long after the time period in question"; (2) that Mr. Yost's testimony was

inconsistent with Plaintiff's testimony regarding the extent of his activities outside of his home;

and (3) that Mr. Yost's testimony is inconsistent with the medical evidence, which suggests

Plaintiff stabilized on medication, and shows "no evidence of hallucinations or delusions" during

periods of stability. *Id.* at 2400. The court finds each of these reasons unsatisfactory.

        The retrospective nature of Mr. Yost's testimony is not, by itself, a germane reason to

dismiss it. *See e.g.*, *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988) (finding evidence should

---

[6] Because Plaintiff applied for DAC benefits in 2014, the SSA's pre-March 2017 regulations apply to his claim.

not be disregarded based solely on its retrospective nature and collecting cases to that effect). Given that the period at issue was twenty years ago, any hearing testimony by any witness— acceptable medical source or otherwise—would necessarily be retrospective. Indeed, both Plaintiff and Mrs. B's testimony was retrospective, as was Dr. Wong's opinion. Mr. Yost relayed observations that were contemporaneous with the relevant period—2000 to 2005—relying on his notes and his recollection of Plaintiff to explain Plaintiff's symptoms and limitations at that time. *See* AR at 2430. This is an entirely acceptable form of evidence. That Mr. Yost's testimony was retrospective is not a germane reason for dismissal.[7]

The ALJ next offers that Mr. Yost's testimony is inconsistent with Plaintiff's testimony. The ALJ appears to be concerned that (1) Mr. Yost testified that he thought Plaintiff got his driver's license in his late twenties, when in fact, Plaintiff got his driver's license when he was 18; (2) Mr. Yost testified that Plaintiff was homeschooled for all of his senior year in high school, when in fact, Plaintiff was only homeschooled for the first half of his senior year; and (3) Mr. Yost testified that Plaintiff never went out, when in fact, Plaintiff testified that he went out occasionally and was not anxious in grocery stores. AR at 2400. These discrepancies are inconsequential. Indeed, Mr. Yost's testimony corroborates that Plaintiff was late in getting his driver's license and was homeschooled during his senior year. That he did not capture the exact duration or timing of these events does not cast significant doubt on the veracity of his overall testimony, particularly given its consistency with the whole of Plaintiff's record.

Additionally, the ALJ mischaracterizes the record. Mr. Yost's testimony that Plaintiff was "not going out almost ever"; that Plaintiff "always had a church group, but at that point…hadn't quite established regular attendance"; that Plaintiff had "almost no friends from high school," was

---

[7] The ALJ properly rejected the third-party function reports filled out by Plaintiff's parents in 2009, 2011, and 2014. *See* AR at 2401-2402 (dismissing Plaintiff's parents' third party function reports because they were written in the present tense) *and A.B. v. Saul,* 2021 WL 2817166 at *3 (finding that Mrs. B's function reports were irrelevant to the instant application for DAC benefits because they referred to Plaintiff's symptoms as of 2009 and 2011); *see also Todd C. v. Berryhill,* No. 3:17-CV-00550-HZ, 2018 WL 4407249, at *15 (D. Or. Sept. 14, 2018) (finding that third-party function reports filled out outside the relevant period were properly disregarded because "[t]he forms do not ask for a retrospective evaluation."). It hardly seems fair that the ALJ could properly dismiss Plaintiff's parents' lay testimony because it was *not* retrospective, and simultaneously dismiss Mr. Yost's lay testimony because it *is* retrospective.

"pretty isolated at home," "wasn't going to stores" and "wasn't driving"; that Plaintiff's parents "provided transportation"; and that, overall,  Plaintiff "wasn't showing up as…a typical 18, early twenties [adult] as far as engagement" (*id.* at 2429), is consistent with Plaintiff's testimony that he hardly ever went out, that when he did, he was accompanied by his parents, that, despite having a driver's license, Plaintiff rarely drove, that he isolated himself from his friends because he could not talk about his symptoms, and that, although he did visit friends and family occasionally, when he was experiencing his symptoms he isolated and did not socialize (*id.* at 508-09). Any significant conflict in this testimony has been manufactured by the ALJ—minor differences between accounts are not "germane" reasons to completely disregard testimony that is holistically consistent with Plaintiff's testimony and medical record.

The ALJ also dismissed Mr. Yost's testimony because it was inconsistent with the medical record. AR at 2400. For the reasons articulated above, Plaintiff's improvement as documented by his psychiatrists is not a germane reason to dismiss Mr. Yost's testimony. Here, the ALJ noted specifically that there is "no evidence of auditory hallucinations" during periods of stability, and thus, dismissed Mr. Yost's testimony that, "at times" Plaintiff's auditory hallucinations persisted despite medication, and that Plaintiff's medication "just turned the volume down." *Id.* Again, the ALJ's characterization of the record is incomplete. As discussed above, Dr. Wong's opinion describes Plaintiff as capable of hiding his psychotic symptoms, and further describes Plaintiff as doing so during his evaluation, at which time he was on Abilify, the same medication he was taking when he was most stable during the relevant period. *Id.* at 864-66. Plaintiff's mother also reported that Plaintiff, while on his medications, "seemed to live in his head." *Id.* at 1778. Plaintiff reported that, during the relevant period, he "couldn't vocalize" what was going on in his head, didn't understand his illness, and was dismissive of his doctors. *Id.* at 1768-79. Thus, Mr. Yost's descriptions of Plaintiff are consistent with the record, which paints the picture of a young man, who either could not or would not discuss the full extent of his psychotic symptoms, and who, though stabilized to some degree on medication, continued to struggle with depression, fatigue, anxiety, and likely, at times, some degree of auditory hallucinations. Again, the court finds that "the ALJ's proffered inconsistencies simply are not inconsistent" and thus, are not a

1   "germane" reason to dismiss Mr. Yost's testimony.

2       B.   _Outstanding Issues and the Utility of Further Proceedings_

3       Having determined that the ALJ provided legally insufficient reasons for rejecting Dr.

4   Wong's full opinion, Plaintiff's testimony, Mrs. B's testimony, and Mr. Yost's testimony, the

5   court next turns to whether any outstanding issues remain that preclude a disability determination,

6   and whether further proceedings would serve a useful purpose.

7       The Commissioner's argument that Plaintiff's success at school and "improvement as

8   documented by the record" constitute an outstanding issue is unsupported by the record, which, as

9   detailed above, provides extensive insight into Plaintiff's relative improvement with medication

10  and the significant effort by Plaintiff and his parents to ensure Plaintiff completed his education.

11  When read in the context of Dr. Wong's opinion, Plaintiff's testimony, Mrs. B's testimony, and

12  Mr. Yost's testimony, it is evident that while Plaintiff was relatively stable when taking Abilify,

13  he continued to experience significant symptoms including depression, anxiety, and fatigue.

14      Further, Plaintiff's application for benefits was submitted in 2014, nearly ten years ago.

15  Since then, Plaintiff has submitted hundreds of pages of medical records; attended three

16  administrative hearings; provided his own testimony and the testimony of third parties including

17  his mother and treating therapist; repeatedly requested, and been denied, the review of a medical

18  expert; and appealed three unfavorable decisions through the Appeals Council to federal court.

19  The administrative record is currently 2,675 pages long. The court cannot fathom what more

20  information the Commissioner could gather from a fourth proceeding. Nor does the Commissioner

21  suggest what actions or evidence might clarify the record, except to say that a "medical expert (if

22  available)" could assist. This suggestion is particularly audacious given that Plaintiff twice

23  requested a medical expert and was twice denied one (_see_ AR at 1761, 2419), and that the

24  Commissioner does not even guarantee that, on remand, a medical expert would be provided. The

25  court will not remand for further proceedings solely for the purpose of offering the ALJ another

26  opportunity to deny Plaintiff benefits, but this time, to find legally sufficient reasons for doing so.

27  This is the very definition of a mulligan and is not acceptable under Ninth Circuit precedent. _See_

28  _Garrison_, 759 F.3d at 1021 (finding that "a remand for the purpose of allowing the ALJ to have a

United States District Court
Northern District of California

24

1    mulligan" does not qualify "as a remand for a 'useful purpose'[.]"). Accordingly, the court finds

2    that there are no outstanding issues and that further administrative proceedings would serve no

3    useful purpose.

4        *C. Disability Determination*

5        Once credited as true, the improperly dismissed evidence together with the administrative

6    record, establishes that Plaintiff was disabled prior to his 22nd birthday. All three vocational

7    experts testified that there would be no work in the national economy for a person who missed

8    work two to three days a month or was off-task 15-20% of the time. AR at 517, 1779-81, 2436.

9    Plaintiff testified that he only had school two to three days a week and still he missed two to three

10    days a month of school, an assessment confirmed by the testimony of Mrs. B and Mr. Yost, both

11    of whom reported frequent absences from school. Based on this testimony alone, a finding of

12    disability is required. Similarly, if Dr. Wong's full opinion were incorporated into Plaintiff's RFC,

13    a finding of disability would necessarily result. Further, on this record, Plaintiff meets Listing

14    12.03, paragraph C, which requires Plaintiff show a "serious and persistent" mental disorder, with

15    at least two years of documented medical history of the disorder; that he received "[m]edical

16    treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that

17    [was] ongoing and that diminished the symptoms and signs of [his] mental disorder" and that he

18    had "marginal adjustment," or "minimal capacity to adapt to changes in [his] environment or to

19    demands that are not already part of [his] daily life." 20 C.F.R. Pt. 404, Subpt. P, App. 1.

20    Crediting the rejected evidence as true, Listing 12.03, paragraph C, describes Plaintiff's mental

21    illness, symptoms, and treatment exactly. Plaintiff has four years of documented diagnoses and

22    treatment for schizoaffective and bipolar disorder prior to his 22nd birthday; throughout the

23    relevant period, Plaintiff regularly visited psychiatrists and adjusted his medications; Plaintiff saw

24    his treating therapist once a week or biweekly for the entire relevant period; and Plaintiff was in a

25    "highly structured setting," provided by his parents, all of which diminished the signs and

26    symptoms of his mental disorder, though it did not relieve him of them entirely. Further, Dr.

27    Wong's opinion conclusively establishes that Plaintiff had a marginal ability to "adjust to changes

28    or demands" not already a part of his life. There is no doubt—serious or otherwise—that Plaintiff

United States District Court
Northern District of California

was disabled prior to his 22nd birthday. Accordingly, a direct award of benefits is warranted, and the court remands for this purpose.

### CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 17) is GRANTED and Defendant's Motion for Remand and Opposition to Plaintiff's Motion (dkt. 22) is correspondingly DENIED. The court REMANDS for the immediate calculation of benefits. A separate judgment shall issue.

**IT IS SO ORDERED.**

Dated: February 22, 2024

_____
ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California